# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

**DONNA NEIGHBORS, Administratrix of the**
**Estate of Joshua Wade Smith, deceased**                        **PLAINTIFF**

**v.**                        **Case No. 2:18-cv-00081-KGB**

**SHELTER MUTUAL**
**INSURANCE COMPANY**                        **DEFENDANT**

## OPINION AND ORDER

Before the Court is a motion for partial summary judgment filed by defendant Shelter Mutual Insurance Company ("Shelter") (Dkt. No. 8). Plaintiff Donna Neighbors, Administratrix of the Estate of Joshua Wade Smith, deceased, responded in opposition (Dkt. No. 13). Shelter replied (Dkt. No. 16). Also before the Court is a motion to quash plaintiff's notice of Rule 30(b)(6) deposition of Shelter Mutual Insurance Company filed by Shelter (Dkt. No. 22), to which Ms. Neighbors responded in opposition (Dkt. No. 24). For the reasons that follow, the Court grants the motion for partial summary judgment (Dkt. No. 8). The Court holds under advisement the motion to quash plaintiff's notice of Rule 30(b)(6) deposition (Dkt. No. 22).

## I. Ripeness Of Motion For Partial Summary Judgment

As a threshold matter, Ms. Neighbors argues that Shelter's motion for partial summary judgment is premature (Dkt. No. 15, at 4). She asserts that no discovery has been conducted in this matter and that only a limited amount of discovery was conducted in her prior filing in Phillips County Case 54-CV-2017-96 (*Id.*). Ms. Neighbors contends that she should have the opportunity to arm herself with whatever facts discovery would yield prior to facing summary judgment (*Id.*). Under Federal Rule of Civil Procedure 56(d), if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition to a motion for

summary judgment, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

"As a general rule, summary judgment is proper only after the nonmovant has had adequate time for discovery." *Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P.*, 687 F.3d 1045, 1049 (8th Cir. 2012) (internal quotations omitted). "This option [under Rule 56(d)] exists to prevent a party from being unfairly thrown out of court by a premature motion for summary judgment." *Id.* at 1050. However, Rule 56 "does not require trial courts to allow parties to conduct discovery before entering summary judgment." *United States ex rel. Small Bus. Admin. v. Light,* 766 F.2d 394, 397 (8th Cir.1985) (per curiam). Thus, district courts possess "wide discretion in denying" Rule 56(d) motions. *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 836 (8th Cir. 2015).

A Rule 56(d) affidavit "must set forth specific facts further discovery might uncover, or what information further discovery might reveal." *Hamilton*, 687 F.3d at 1049 (affirming denial of Rule 56(d) motion where district court stayed discovery and then ruled on motion for summary judgment, determining plaintiff failed to show what further facts he would uncover through a Rule 56(d) extension). A nonmovant seeking relief under Rule 56(d) must do more than speculate that it may discover additional facts that would overcome a motion for summary judgment, *see Stanback v. Best Diversified Prods.,* 180 F.3d 903, 911 (8th Cir.1999), and must submit an affidavit showing "'what specific facts further discovery might unveil.'" *Id.* (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1238 (8th Cir.1997)). "Where a party fails to carry [his] burden under Rule [56(d)], 'postponement of a ruling on a motion for summary judgment is unjustified.'" *Id.* (quoting *Humphreys v. Roche Biomedical Labs., Inc.,* 990 F.2d 1078, 1081 (8th Cir.1993)).

Ms. Neighbors failed to submit an affidavit or declaration explaining what facts or information further discovery might uncover and why she cannot present facts essential to justify her opposition to Shelter's motion for partial summary judgment at this time. Therefore, the Court rejects Ms. Neighbors' argument that Shelter's motion for partial summary judgment is premature (Dkt. No. 15, at 4).

## II.     Motion For Partial Summary Judgment

### A.     Factual Background

Unless otherwise noted, the following facts are taken from Shelter's statement of undisputed material facts in support of Shelter's motion for partial summary judgment and from Ms. Neighbors' statement of disputed and undisputed facts (Dkt. Nos. 10, 14). The Court notes that Local Rule 56.1 of the Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas provides that all material facts set forth in the statement filed by the moving party shall be deemed admitted unless controverted by the statement filed by the non-moving party. Local Rule 56.1(c). As such, the Court deems admitted each parties' statement of material facts to the extent statements are not controverted by the opposing party.

### 1.     The Motor Vehicle Accident

The motor vehicle accident that is the subject of this lawsuit occurred on or about March 24, 2017, in Hazen, Prairie County, Arkansas (Dkt. No. 14, ¶ 1). Shelter alleges that Joshua Wade Smith, deceased, occupied the insured vehicle solely as the driver (Dkt. No. 10, ¶ 1). Ms. Neighbors asserts that Mr. Smith occupied the insured vehicle as the driver prior to the first impact of the accident (Dkt. No. 14, ¶ 1). The vehicle driven by Mr. Smith was owned by the named insured, Gretchen Brannon Ferebee, and was insured by Shelter (*Id.*, ¶ 2). Mr. Smith was not listed as an insured on the Declarations, nor was he related to the named insured, Ms. Ferebee, at the

time of the accident (*Id.*, ¶ 3). Ms. Neighbors alleges that Mr. Smith did reside with the named insured on the night prior to the accident (*Id.*). Ms. Neighbors asserts that she has had insufficient time to discover the extent of the residence other than that provided in Ms. Ferebee's deposition given in a related matter involving the same accident as at issue herein (*Id.*). The Court notes that, in her deposition given in another matter, Ms. Ferebee was asked whether she and Mr. Smith lived together at the time of the accident or before and replied that they did not (Dkt. No. 8-2, at 2). Further, Ms. Neighbors contends that Mr. Smith had no insurance coverage other than that on Ms. Ferebee's vehicle (Dkt. No. 14, ¶ 3).

Mr. Smith and his passengers, Ms. Ferebee and non-party Courtney Young, were traveling west on Interstate 40 when Mr. Smith lost control of the vehicle and then crossed onto the shoulder and struck the adjacent guardrail (*Id.*, ¶ 4). Ms. Neighbors alleges that Mr. Smith lost control of the vehicle due to impact by another vehicle (*Id.*). Shelter contends that the vehicle overturned and, in the process of overturning, Mr. Smith and Ms. Ferebee were ejected from the vehicle – Mr. Smith from the driver's seat and Ms. Ferebee from the passenger seat (Dkt. No. 10, ¶ 4). Shelter asserts that, after being ejected, the vehicle then rolled over Mr. Smith, and Mr. Smith was pronounced dead at the scene by the Prairie County Coroner (*Id.*). Ms. Neighbors disputes the location from where Shelter asserts Mr. Smith was ejected. Ms. Neighbors contends that, "at the instance of his ejectment, after striking the guard rail, it is impossible to know [Mr. Smith's] exact location inside or even outside the vehicle at this time" (Dkt. No. 14, ¶ 4). However, Ms. Neighbors does not dispute that, at the instant that Ms. Ferebee's vehicle was struck by the unknown vehicle, Mr. Smith was occupying the driver's seat in Ms. Ferebee's vehicle (*Id.*).

The parties disagree about what the Prairie County Coroner's certificate of death states about how Mr. Smith died. According to Shelter, the chain of events listed on the death certificate

indicates that Mr. Smith's death occurred prior to the vehicle rolling over him (Dkt. No. 10, ¶ 5) (emphasis omitted). Citing the Prairie County Coroner Byrum Kelly's affidavit, Ms. Neighbors disputes Shelter's interpretation of the death certificate (Dkt. No. 14, ¶ 5).

The parties also disagree about a letter sent by counsel for Ms. Neighbors to Shelter on April 21, 2017. Shelter asserts that, on April 21, 2017, Ms. Neighbors submitted a demand on Shelter for payment of "Med-pay/PIP Uninsured Motorist and Accidental Death [sic] benefits" (Dkt. No. 10, ¶ 6) (edit in original). Shelter submits that absent from the demand letter was any proof of any damages, including medical or funeral expenses, incurred by Mr. Smith (*Id.*). Ms. Neighbors disputes that she submitted a "demand" letter for payment (Dkt. No. 14, ¶ 6). Instead, she maintains that the April 21, 2017, letter was merely a letter of representation with no "demand" for payment; she readily admits that said letter of representation contained no proof of medical or funeral expenses (*Id.*). It is undisputed that Mr. Smith did not incur medical expenses and that no such expenses were submitted to Shelter (*Id.*, ¶ 7). Ms. Neighbors argues that Mr. Smith incurred funeral expenses (*Id.*).

Shelter maintains that it responded to Ms. Neighbors' demand on May 2, 2017, denying Ms. Neighbors' claim for medical payments or accidental death benefits as Mr. Smith did not meet the definition of an "insured" under the Policy (Dkt. No. 10, ¶ 8). According to Shelter, it included with this correspondence its previous letter to Ms. Neighbors from April 5, 2017, regarding its investigation into and denial of the claim for the same reasons (*Id.*). Ms. Neighbors does not dispute that Shelter responded to her letter of representation on May 2, 2017, denying Ms. Neighbors' claim and coverage therefore (Dkt. No. 14, ¶ 8).

## 2. The Policy

Ms. Neighbors filed her complaint on May 12, 2017, alleging entitlement to medical payments and funeral expense benefits, accidental death benefits, and uninsured motorist benefits, in addition to damages for Shelter's alleged bad faith denial of payments of these benefits (*Id.*, ¶ 9). The Policy issued by Shelter and under which Ms. Neighbors claims entitlement to the limits of the medical payments and accidental death benefits contains the following provisions:

INSURANCE AGREEMENT FOR COVERAGE C

Subject to all conditions, exclusions, and limitations of **our** liability, stated in this policy, **we** will pay the **reasonable charges** for **necessary goods and services for** the treatment of **bodily injury** sustained by an **insured**, if such **bodily injury** directly results from an **accident** caused by the **occupancy**, **use**, or **maintenance** of an **auto**. The **reasonable charges** *must be incurred* within two years of the **accident** date.

Subject to the limit of **our** liability for this coverage stated in the **Declarations**, **we** will pay the **reasonable charges** for funeral services of an **insured**, if death directly results from an **accident** caused by the **occupancy**, **use**, or **maintenance** of an **auto**. The **reasonable charges** *must be incurred* within two years of the **accident** date.

(Dkt. No. 14, ¶ 9) (emphasis in original).

The Policy of insurance contains the following definition of an "insured" applicable to medical payments coverage:

DEFINITION OF **INSURED** USED IN COVERAGE C

In Coverage C **insured** means **you** or a **relative**.

**Insured** also means:

\*\*\*

(2)   **Individuals**, *other than those **occupying** a vehicle*, who are **struck by** the **described auto**, while they are:
(a) Pedestrians;
(b) Bicyclists;
(c) Motorcyclists;
(d) In a horse-drawn wagon or cart; or

(e) Riding on an animal.

(*Id.*) (emphasis in original).

Shelter asserts that the definition of an "insured" applicable to accident death benefits coverage is the same as the definition applicable to medical payments coverage:

DEFINITION OF **INSURED** USED IN COVERAGE D

In Coverage D **insured** means **you** or a **relative**.

**Insured** can also mean:

\*\*\*

(2)    **Individuals**, *other than those **occupying** a vehicle*, who are **struck by** the **described auto**, while they are:
(a) Pedestrians;
(b) Bicyclists;
(c) Motorcyclists;
(d) In a horse-drawn wagon or cart; or
(e) Riding on an animal.

(Dkt. No. 10, ¶ 12) (emphasis in original).

Shelter further asserts that the Policy also contains the following definitions applicable to medical payments and funeral benefits, accidental death benefits, as well as uninsured motorist benefits:

"**You**" is defined in the Policy as "any **person** listed as a **named insured** in the **Declarations** and, if that **person** is an **individual**, his or her **spouse**."

"**Relative**"[] as defined in the Policy "means an **individual** related to **you** by blood, marriage, or adoption, who is a **resident** of **your** household."

"Passenger" is also defined as an "insured" under the Policy, but the terms does [sic] not include the driver:

"**Passenger** means an **individual** who is **occupying** one of the seats of a vehicle with **permission** *but does not include the **operator** of a vehicle*."

(*Id.*, ¶ 13) (emphasis in original).

Shelter contends that there is no dispute that Mr. Smith was occupying the insured vehicle as the driver but was not the named insured, a relative of the named insured, a member of the named insured's household, nor a "passenger," "pedestrian," "bicyclist," "motorcyclist," or traveling "in a horse-drawn wagon or cart" (Dkt. No. 10, ¶ 17). Ms. Neighbors disputes whether Mr. Smith was a member of the insured's household at the time of the accident as she claims that she has been unable to investigate adequately that aspect of Ms. Ferebee and Mr. Smith's relationship (Dkt. No. 14, ¶ 14). Ms. Neighbors does not dispute that Mr. Smith was occupying the insured vehicle as the driver just prior to the accident, but she disputes that Mr. Smith was occupying the vehicle as a driver at all subsequent times and at the time he was struck by Ms. Ferebee's insured vehicle as alleged in paragraph 17 of Shelter's statement of undisputed material facts (*Id.*). Ms. Neighbors submits that the applicable statutes do not define "passenger," "pedestrian," "bicyclist," "motorcyclist," or traveling "in a horse-drawn wagon or cart" but merely provide coverage to "persons other than those occupying another vehicle struck by the insured motor vehicle" (*Id.*).

Shelter argues that Ms. Neighbors does not allege that Shelter wrongfully applied the terms of the Policy with regard to the definition of "insured" under the medical payments or accidental death benefits (Dkt. No. 10, ¶ 21). Ms. Neighbors disputes that assertion and contends that Shelter's actions and its policy are contrary, on their face, to the requirements of Arkansas law (Dkt. No. 14, ¶ 19).

### 3. Applicable Arkansas Statutes

Shelter argues that the Policy at issue mirrors the requirements of the applicable statutes, Arkansas Code Annotated §§ 23-89-202 and 23-89-204 (Dkt. No. 10, ¶ 14). According to Shelter, for coverage to apply, the applicable statute Arkansas Code Annotated § 23-89-202 requires that

the deceased be "the named insured," a "member[] of the [named insured's] family residing in the same household," a "passenger[] injured while occupying the insured motor vehicle," and a "person[] other than those occupying another vehicle struck by the insured motor vehicle" (*Id.*, ¶ 15). Shelter asserts that, in order for accidental death benefits to apply, the statute continues to require that the deceased be an "insured" under the Policy (*Id.*). Shelter submits that the statute states, in pertinent part, that "[t]he sum of five thousand dollars ($5,000)[] to be paid to the personal representative of the ***insured*** . . . []" (*Id.*) (emphasis in original). Shelter further submits that coverage required to be provided to "insured" under Arkansas Code Annotated § 23-89-202 also applies "***only*** to occupants of the insured vehicle and to persons struck by the insured vehicle, ***including*** pedestrians, bicyclists, motorcyclists, persons in a horse-drawn wagon or cart, and persons riding on an animal, ***and to none other***" (*Id.*, ¶ 16) (emphasis in original).

Ms. Neighbors does not dispute that the definition in the Policy at issue provides that an "insured" for accidental death benefits is the same as the definition applicable to medical payments coverage, but she disputes that the definition is co-extensive with the requirements of Arkansas law and asserts that it is contrary to Arkansas Code Annotated §§ 23-89-202 and 23-89-204 (Dkt. No. 14, ¶ 10). Similarly, Ms. Neighbors does not dispute that such language is contained in the Policy at issue but disputes that the cited language is co-extensive with the requirements of Arkansas law and asserts that it is contrary to Arkansas Code Annotated §§ 23-89-202 and 23-89-204 (*Id.*, ¶ 11). Ms. Neighbors disputes that the Policy at issue mirrors the requirements of the applicable statutes Arkansas Code Annotated §§ 23-89-202 and 23-89-204 because, for coverage to apply, the applicable statute Arkansas Code Annotated § 23-89-202 requires that Mr. Smith be "the named insured," "members of [the named insured's] family residing in the same household,"

a "passenger[] injured while occupying the insured motor vehicle, and a "person[] other than those occupying another vehicle struck by the insured motor vehicle" (*Id.*, ¶ 12).

Ms. Neighbors submits that, specifically, Mr. Smith need only meet one of these classes of persons to be insured pursuant to the statute, not all as indicated by Shelter's misquoting of the statute (*Id.*). Ms. Neighbors asserts that Mr. Smith becomes an insured under Arkansas law by meeting any one of the definitions provided in the statute, just as he does for the accidental death benefits to apply (*Id.*). Further, Ms. Neighbors submits that coverage required to be provided to an "insured" under Arkansas Code Annotated § 23-89-202 also applies "only to occupants of the insured vehicle and to persons struck by the insured vehicle, including pedestrians, bicyclists, motorcyclists, persons in a horse-drawn wagon or cart, and persons riding on an animal, and to none other" (*Id.*, ¶ 13).

According to Ms. Neighbors, Arkansas Code Annotated § 23-89-204(a) speaks for itself (*Id.*). Ms. Neighbors argues that Shelter encourages a strained reading of the statute that by "including" certain classes of persons, it excludes all others (*Id.*). Ms. Neighbors asserts that Shelter's strained interpretation of Arkansas Code Annotated § 23-89-204(a)'s meaning as set out in paragraph 16 of its statement of undisputed material facts is disputed, citing the affidavit and resume of Robin Bryant, an English professor at the University of Arkansas, Phillips County Community College (*Id.*).

Shelter contends that, under the express terms of the Policy and the applicable statutes, Mr. Smith was not an "insured," and there is no coverage for medical payments, funeral benefits, or accidental death benefits (Dkt. No. 10, ¶ 18). Ms. Neighbors disputes this contention and instead maintains that Mr. Smith meets the definition of an insured under Arkansas Code Annotated § 23-

89-202 as an occupant/passenger and as a person "other than those occupying another vehicle struck by the insured motor vehicle" (Dkt. No. 14, ¶ 15).

### 4.    Reasonable Proof

Arkansas Code Annotated § 23-89-202 requires that reasonable and necessary medical and funeral expenses be "incurred" within two years of the accident (*Id.*, ¶ 16).  Ms. Neighbors did not provide Shelter with reasonable proof of entitlement to benefits prior to filing suit (*Id.*).  Ms. Neighbors submits that the suit was filed only after Shelter responded to her letter of representation that "no" benefits or coverage were owed to Mr. Smith (*Id.*).

Shelter further contends that, under Arkansas law and the conditions set forth in the Policy, Ms. Neighbors failed to provide reasonable proof of entitlement to medical payments, funeral benefits, or accidental death benefits at the time the demand on Shelter was made or at any time prior to filing suit (Dkt. No. 10, ¶ 20).  Ms. Neighbors disputes these assertions and submits that all of Mr. Smith's funeral expenses pursuant to Arkansas Code Annotated § 23-89-202 are reasonable and necessary and incurred within two years of the accident (Dkt. No. 14, ¶ 17).  Ms. Neighbors asserts that proof of said funeral expenses was provided to Shelter immediately upon request but only after Shelter had unequivocally denied responsibility for any expenses, alleging that Mr. Smith was not an insured and therefore entitled to no benefits under the Policy (*Id.*).  Further, Ms. Neighbors disputes Shelter's assertion that Arkansas law and the conditions set forth in the Policy require Ms. Neighbors to provide reasonable proof of the amount of Mr. Smith's entitlement to medical payments, funeral benefits, or accidental death benefits at the time the demand on Shelter was made or at any time prior to filing suit as a condition precedent to Ms. Neighbors' right to seek redress with the Court (*Id.*, ¶ 18).  Ms. Neighbors maintains that this is especially true in the light of Shelter's previous denial of any benefits or coverage (*Id.*).

### 5.      Alleged Failure To Investigate

Shelter maintains that the allegations that Shelter failed to investigate Ms. Neighbors' claim are untrue, as demonstrated by the evidence, and fatally insufficient under Arkansas law to sustain a claim of bad faith (Dkt. No. 10, ¶ 21).  Ms. Neighbors contends that Shelter's denial of coverage on April 5, 2017, prior to even receiving the accident report on April 6, 2017, is an intentional and bad faith attempt to avoid coverage of a valid claim because Shelter sent a denial to the "Joshua Smith Estate C/O Personal Representative" within 12 days of the accident but without benefit of the accident report and never addressing the fact that Mr. Smith was struck by the insured vehicle (Dkt. No. 14, ¶ 19).

### B.      Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact in dispute and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).  "The evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### C.     Discussion:  Coverage Under Shelter Policy

Shelter moves for partial summary judgment on Ms. Neighbors' claims for entitlement to: (1) medical payments, funeral benefits, or accidental death benefits; (2) damages for breach of contract, statutory penalties, and attorney's fees; and (3) bad faith and punitive damages (Dkt. No. 8, ¶ 1).  According to Shelter, Mr. Smith does not qualify as an "insured" under the medical payments and accidental death benefits provisions of the Policy (Dkt. No. 9, at 4).  Shelter argues that the evidence demonstrates that Mr. Smith was driving the insured vehicle when he lost control of it and that Mr. Smith's status as the driver/operator of the insured vehicle never changed despite being ejected (Dkt. No. 9, at 7).  Shelter contends that Mr. Smith was not an "insured" under the clear definition of the Policy and, as such, there is no coverage (*Id.*, at 8).

The Court finds no response in Ms. Neighbors' filings to Shelter's argument that Mr. Smith is not covered under the Policy.  Instead, Ms. Neighbors argues that Shelter's Policy illegally limits classes of insureds through its definitions, in contravention of Arkansas Code Annotated §§ 23-89-202 and 23-89-204 (Dkt. No. 15, at 4-7).  The Court will address this argument in the next section.  First, the Court looks to the language of the Policy to determine if it covers the claims alleged by Ms. Neighbors against Shelter.  The Court determines the language of the Policy is unambiguous and affords Mr. Smith under the circumstances no coverage for purposes of medical payments coverage or accident death benefits coverage under the Policy.

### 1.     Arkansas Law Applicable To Coverage Disputes

Arkansas law "regarding the construction of an insurance contract is well settled." *Norris v. State Farm Fire & Cas. Co.*, 16 S.W.3d 242, 244 (Ark. 2000).  "The language in an insurance

policy is to be construed in its plain, ordinary, popular sense." *Id.* (citing *CNA Ins. Co. v. McGinnis*, 666 S.W.2d 689, 691 (Ark. 1984). "Exclusionary endorsements must adhere to the general requirements that the insurance terms must be expressed in clear and unambiguous language." *Castaneda v. Progressive Classic Ins. Co.*, 166 S.W.3d 556, 560 (Ark. 2004) (citing *Norris*, 16 S.W.2d at 242). "If the language of the policy is unambiguous," then the Court must "give effect to the plain language of the policy without resorting to the rules of construction." *Id.* (citing *Elam v. First Unum Life Ins. Co.*, 57 S.W.3d 165, 169 (Ark. 2001)). Alternatively, if the language of the policy is ambiguous, the Court must "construe the policy liberally in favor of the insured and strictly against the insurer." *Id.* (citing *Elam*, 57 S.W.3d at 169). "The terms of an insurance contract are not to be rewritten under the rule of strict construction against the company issuing it so as to bind the insurer to a risk which is plainly excluded and for which it was not paid." *Castaneda*, 166 S.W.3d at 561 (Ark. 2004) (citing *Southern Farm Bureau Casualty Ins. Co. v. Williams*, 543 S.W.2d 467 (Ark. 1976)).

"Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation." *Id.* (citing *Harasyn v. St. Paul Guardian Ins. Co.*, 75 S.W.3d 696, 701 (Ark. 2002)). Whether an insurance policy is ambiguous is a question of law to be resolved by the Court. *Id.* Although the meaning of an ambiguity may become a question for the fact-finder if parole evidence has been admitted to resolve that ambiguity, *see Minerva Enterprises, Inc. v. Bituminous Casualty Corp.,* 851 S.W.2d 403 (1993), "where the meaning of the language of a written contract does not depend on disputed extrinsic evidence, the construction and legal effect of the contract are questions of law." *Smith v. Prudential Prop. & Cas. Ins. Co.*, 10 S.W.3d 846, 850 (2000) (citing *Duvall v. Massachusetts Indem. & Life Ins. Co.,* 748 S.W.2d 650 (1988); *Security Ins. Co. v. Owen,* 480 S.W.2d 558 (1972)).

## 2. Relevant Policy Language

Although the parties submitted excerpts of the Policy with their summary judgment briefing, the Court requested that Shelter submit a copy of the Policy in its entirety for the Court's consideration, which is attached to the Court's Notice entered on March 26, 2019, as Exhibit A (Dkt. No. 32). The Policy contains the following provisions:

INSURING AGREEMENT FOR COVERAGE C

> Subject to all conditions, exclusions, and limitations of **our** liability, stated in this policy, **we** will pay the **reasonable charges** for **necessary goods and services for** the treatment of **bodily injury** sustained by an **insured**, if such **bodily injury** directly results from an **accident** caused by the **occupancy**, **use**, or **maintenance** of an **auto**. The **reasonable charges** *must be incurred* within two years of the **accident** date.

> Subject to the limit of **our** liability for this coverage stated in the **Declarations**, **we** will pay the **reasonable charges** for funeral services of an **insured**, if death directly results from an **accident** caused by the **occupancy**, **use**, or **maintenance** of an **auto**. The **reasonable charges** *must be incurred* within two years of the **accident** date.

(Dkt. No. 8-4, at 5) (emphasis in original).

The definition of "insured" applicable to medical payments coverage is as follows:

DEFINITION OF **INSURED** USED IN COVERAGE C

In Coverage C **insured** means **you** or a **relative**. **Insured** also means:

(1)  **Passengers** in the **described auto**; but these **individuals** become **insureds** only after the limits of all other motor vehicle medical and hospital benefits insurance in which they are specifically named as insureds have been exhausted; and

(2)  **Individuals**, *other than those occupying a vehicle*, who are **struck by** the **described auto**, while they are:
    (a)  Pedestrians;
    (b)  Bicyclists;
    (c)  Motorcyclists;
    (d)  In a horse-drawn wagon or cart; or
    (e)  Riding on an animal . . .

(*Id.*) (emphasis in original).

15

The definition of an "insured" applicable to accident death benefits coverage is the same as the definition applicable to medical payments coverage:

DEFINITION OF **INSURED** USED IN COVERAGE D

In Coverage D **insured** means **you** or a **relative**.  **Insured** can also mean:

(1)     **Passengers** in the **described auto**; but these **individuals** become **insureds** only after the limits of all other motor vehicle accidental death benefits insurance in which they are specifically named as insureds have been exhausted; and

(2)     **Individuals**, *other than those **occupying** a vehicle*, who are **struck by** the **described auto**, while they are:
    (a)     Pedestrians;
    (b)     Bicyclists;
    (c)     Motorcyclists;
    (d)     In a horse-drawn wagon or cart; or
    (e)     Riding on an animal . . .

(*Id.*, at 6) (emphasis in original).

The Policy contains the following definitions applicable to medical payments and funeral benefits, accidental death benefits, and uninsured motorist benefits:

(1)     **Accident** means an **occurrence** that was neither expected nor intended.  The following types of **occurrences** are excluded from the definition of **accident**:
    (a)     Any **occurrence** that an **insured** intended to result in **bodily injury** or **property damage**; and
    (b)     Any **occurrence** that was intended by an **insured**, if a reasonable **individual** would have expected it to result in **bodily injury** or **property damage**.
. . .

(5)     **Claim** means a request by any **person** for benefits under a coverage provided by this policy as a result of a single accident.  It includes lawsuits, requests for the payment of money, requests that **we** take any action, or extend the benefits of any coverage provided by this policy.
. . .

(23)     **Named insured** means any **person** listed in the **Declarations** under the heading "Named Insured."  **Persons** listed under other headings are not **named insureds** unless they are also listed under the heading "Named Insured" (Dkt. No. 8-4, at 2) (emphasis in original).
. . .

(26)  **Occupy** means being in physical contact with a vehicle while:
    (a)    In it;
    (b)    Getting into it; or
    (c)    Getting out of it.
An **individual** who is not in physical contact with a vehicle is not **occupying** it (*Id.*) (emphasis in original).

(27)  **Occurrence** means an action or event, or a series of actions or events, that:
    (a)    Started abruptly;
    (b)    During the policy period;
    (c)    Directly resulted in **bodily injury** or **property damage**; and
    (d)    May result in a **claim**.

(28)  **Operator** means an **individual** who is **using** a vehicle (*Id.*) (emphasis in original).

. . .

(31)  **Passenger** means an **individual** who is **occupying** one of the seats of a vehicle with **permission** but does not include the **operator** of a vehicle (*Id.*) (emphasis in original).

. . .

(40)  **Relative** means an **individual** related to **you** by blood, marriage, or adoption, who is a **resident** of **your** household . . . (*Id.*, at 3) (emphasis in original).

. . .

(44)  **Reside** means to actually live in a location with the intent to make that place, and no other, one's primary, and permanent, home . . . (*Id.*) (emphasis in original).

(45)  **Spouse** means the lawful husband or wife of any **individual** defined as an **insured** under the applicable part of this policy, if he or she is a **resident** of the same household as that **insured** (*Id.*) (emphasis in original).

. . .

(54)  **Use** means physically controlling, or attempting to physically control, the movements of a vehicle.  It includes any emergency repairs performed in the course of a trip, if those repairs are necessary to the continued **use** of the vehicle (*Id.*, at 4) (emphasis in original).

. . .

(58)  **You** means any **person** listed as a **named insured** in the **Declarations** and, if that **person** is an **individual**, his or her **spouse** (*Id.*) (emphasis in original).

(Dkt. No. 32, Exhibit A, at 5-8).

### 3. Named Insured Or Relative

Based on the unambiguous, plain language of the Policy, the Court determines Mr. Smith does not qualify as an "insured" as a named insured or as a relative. In this case, it is undisputed that Ms. Ferebee is the named insured and owner of the insured vehicle involved in the accident on March 24, 2017 (Dkt. No. 14, ¶ 2). Ms. Neighbors admits that Mr. Smith was not listed as an insured on the Declarations, nor was he related to the named insured, Ms. Ferebee, at the time of the accident (*Id.*, ¶ 3).

Ms. Neighbors does not argue in her brief but submits in her statement of disputed and undisputed facts that Mr. Smith did reside with the named insured on the night prior to the accident (*Id.*). In support of this assertion, Ms. Neighbors submits the following excerpt from Ms. Ferebee's deposition testimony:

> Q: And how long were the three of you together at your brother's house that evening?
>
> A: It was a while before we left from there that morning, so hours, you know. I slept a little bit.
>
> Q: Okay. So the three of you were together beginning when the night before?
>
> A: I'm going to say 11:00 o'clock. I'm not for sure.
>
> Q: P.M.?
>
> A: P.M., yes, sir. I'm not for sure. We were there at his house.

(Dkt. No. 13-1). In the statement of disputed and undisputed facts, Ms. Neighbors also asserts that she has had insufficient time to discover the extent of the residence other than that provided in Ms. Ferebee's deposition given in a related matter involving the same accident as at issue herein (*Id.*).

The Court notes that, in her deposition given in another matter, Ms. Ferebee was asked whether she and Mr. Smith lived together at the time of the accident or before and replied that they did not (Dkt. No. 8-2, at 2).

Based on the plain language of the Policy, and construing the record evidence and all reasonable inferences in favor of Ms. Neighbors, the Court finds the fact that Mr. Smith spent the night before the accident in the same residence as Ms. Ferebee irrelevant to the issue of coverage. Under the Policy, "reside" means actually to live in a location with the intent to make that place, and no other, one's primary, and permanent, home (Dkt. No. 8-4, at 3). Further, as the Court discussed *supra*, Ms. Neighbors failed to follow Federal Rule of Civil Procedure 56(d); she may not defeat summary judgment by relying on the argument that she has had insufficient time to discover the extent of the residence other than the description provided in Ms. Ferebee's deposition given in a related matter involving the March 24, 2017, accident. The Court concludes that Mr. Smith was not an "insured" as a named insured or as a relative for purposes of medical payments coverage or accident death benefits coverage under the Policy.

### 4. Passenger Or Struck By Insured Vehicle

The Court next determines whether Mr. Smith is an "insured" for purposes of medical payments coverage or accident death benefits coverage under the Policy as a passenger or as an individual, other than one occupying the vehicle, who is struck by the insured vehicle, while he is a pedestrian, bicyclist, motorcyclist, in a horse-drawn wagon or cart, or riding on an animal (*Id.*, at 5-6).

As a threshold matter, neither party cites this Court to authority for the proposition that, even though it is undisputed that Mr. Smith was driving the insured vehicle just prior to and at the moment of the accident, during the course of the accident and solely through the circumstances of

the accident, not through conscious choice or conduct, he can change roles under the terms of the Policy. In other words, neither party cites this Court to authority that permits Mr. Smith's status as driver or operator of the vehicle to transform into a "passenger" because he was ejected from the vehicle during the accident. Similarly, neither party cites this Court to authority that permits Mr. Smith's status as driver or operator to transform into a "an individual, other than one occupying the vehicle, who is struck by the insured vehicle, while he is a pedestrian, bicyclist, motorcyclist, in a horse-drawn wagon or cart, or riding on an animal" because he was ejected from the vehicle and struck by it during the accident.

Shelter contends that Mr. Smith was not simply occupying the insured vehicle prior to and at the moment the accident occurred but was in fact driving the insured vehicle when he lost control of it (Dkt. No. 9, at 7). Shelter argues that Mr. Smith's status as the driver of the vehicle cannot change to a passenger (Dkt. No. 16, at 3). According to Shelter, Mr. Smith would need to have formed an intent to cease operating or physically controlling the vehicle and relinquish that control to another, and Shelter contends that there is no proof that occurred here (*Id.*). Shelter further submits that the Policy's definition of "passenger" specifically states that it "does not include the operator of a vehicle" (*Id.*). The Policy defines "passenger" as an individual who is occupying one of the seats of a vehicle with permission but does not include the operator of a vehicle (*Id.*, at 2). It is undisputed that Mr. Smith was driving the insured vehicle just prior to and at the moment of the accident (Dkt. No. 14, ¶ 14).

The parties cite no Arkansas authority, and this Court could find no Arkansas authority, addressing this issue. When examining this issue, the Court reviewed the following cases and finds the reasoning instructive.

In *Pemco Mutual Insurance Co. v. Utterback*, 960 P.2d 453 (Wash. Ct. App. 1998), the court determined that an incident in which a pedestrian was injured in two separate impacts when a car lurched forward, backed up, and lurched forward again was a single accident for purposes of automobile insurance coverage, part of a continuous sequence set in motion by the driver's original negligent conduct.[1]   In the case, James Utterback was injured when the insured's car lurched forward, jumped the curb, and knocked Mr. Utterback against the wall of a building as he was walking on the sidewalk. *Id.* at 453-54.  The insured driver backed up several feet. *Id.* at 454. Then, the car lurched forward again pinning Mr. Utterback to the wall and injuring him again. *Id.*

Mr. Utterback sued the insurer Pemco Mutual Insurance Company ("Pemco") to recover for his injuries, asserting two causes of action for what he alleged were two separate accidents. *Id.* The insured's automobile policy imposed a $110,000.00 maximum for a single accident. *Id.* Pemco denied that two separate accidents had occurred and filed an action for declaratory judgment to that effect. *Id.*  The trial court granted summary judgment in favor of Pemco, and the Washington Court of Appeals affirmed. *Id.* at 457.

The court determined that the insured's original negligent conduct caused the second impact with Mr. Utterback in a continuous sequence and that the incident was therefore a single accident for coverage purposes. *Id.*  Although no Washington state court had previously examined whether one or two accidents occur when a single vehicle strikes the same person twice in rapid succession, the Washington Supreme Court had adopted in a prior case a "cause" analysis for determining the number of accidents, holding that all injuries or damage within the scope of a

---

[1]  This Court notes that, to interpret other policy language, the Arkansas Supreme Court has cited to and relied upon precedent from Washington State. *See Smith v. Southern Farm Bureau Casualty Ins. Co.*, 114 S.W.3d 205 (Ark. 2003) (quoting and citing with approval *Matthews v. Penn-American Ins. Co.*, 25 F.3d 451 (Wash. Ct. App. 2001), regarding the phrase "immediate family" as used in policy language).

single, "proximate, uninterrupted, and continuing cause" must be treated as arising from a single accident. *Id.* at 454. The trial court determined that the interdependent nature of the two impacts and their continuity and proximity in time and location all lead to the conclusion that just one accident occurred. *Id.* at 456. The insured never regained control of the car's injury inflicting potential or the situation in general following the first impact, based on the record evidence. *Id.* at 456-57. The Washington Court of Appeals determined that there was just one proximate and continuing cause of both impacts – the insured's initial negligence that caused her to lose control of the vehicle. *Id.* at 457.

Likewise, in *Unigard Insurance Co. v. U.S. Fidelity and Guaranty Co.*, the Idaho Court of Appeals examined a similar situation and acknowledged the case presented an issue of first impression in Idaho. 728 P.2d 780 (Idaho Ct. App. 1986). The court was asked to decide whether multiple incidents of damage, produced by a closely related series of repetitive events, constitute a single "occurrence" within the meaning of a liability insurance policy. *Id.* at 781.

The court first determined that the plain language of the policy did not resolve the dispute. *Id.* at 783. Then, the court examined essentially three approaches to the issue of whether an event is a single occurrence or multiple occurrences for purposes of coverage. *Id.* at 782. There, the court explained:

> The cases tend to revolve around specific fact patterns. The courts have directed attention to the relationship among the acts causing injury and to the temporal and spatial proximity of the injuries themselves. Three methodologies have emerged. The earliest, but now largely discredited, approach equates the number of parties suffering bodily injury or property damage with the number of accidents or occurrences. This has since been labeled the "result" or "effect" approach. Other courts have used a "proximate cause" or "causation" approach. It treats all damage or injuries within the scope of a single proximate cause as arising from one accident or occurrence. The most recent formulation, and the approach that we find most useful for cases of the present type, has been termed the "functional event" or "continuous process" test. It focuses not upon the individual events of damage but upon the underlying cause. The critical inquiry is whether or not the damage-

causing process was continuous and repetitive. *See, e.g., Champion International Corp. v. Continental Casualty Co.,* 546 F.2d 502 (2nd Cir.1976); *E.B. Michaels v. Mutual Marine Office, Inc.,* 472 F.Supp. 26 (S.D.N.Y.1979).

*Unigard*, 728 P.2d at 782 (internal citations omitted).

The *Unigard* court determined that the continuous process approach best reflected an insured's reasonable expectation of coverage. *Id.* at 782. In other words, "a lay person is likely to view the harm caused by a single, continuous process as one 'occurrence.'" *Id.*.

Here, Shelter's policy defines accident, claim, and occurrence as follows.

> (2)    **Accident** means an **occurrence** that was neither expected nor intended. The following types of **occurrences** are excluded from the definition of **accident**:
>> (a)    Any **occurrence** that an **insured** intended to result in **bodily injury** or **property damage**; and
>> (b)    Any **occurrence** that was intended by an **insured**, if a reasonable **individual** would have expected it to result in **bodily injury** or **property damage**.
> . . .
>
> (5)    **Claim** means a request by any **person** for benefits under a coverage provided by this policy as a result of a single accident. It includes lawsuits, requests for the payment of money, requests that **we** take any action, or extend the benefits of any coverage provided by this policy.
> . . .
>
> (27)    **Occurrence** means an action or event, or a series of actions or events, that:
>> (a)    Started abruptly;
>> (b)    During the policy period;
>> (c)    Directly resulted in **bodily injury** or **property damage**; and
>> (d)    May result in a **claim**.

(Dkt. No. 32, Exhibit A, at 5, 6).

The Policy language is unambiguous, but the Court concedes that the Policy language does not clearly resolve this issue. The Court also notes that Arkansas specifically recognizes and retains in the context of insurance coverage concepts of tort liability. *See* Ark. Code Ann. § 23-89-206. It is undisputed that Mr. Smith was driving the insured vehicle just prior to and at the moment of the accident. There is no evidence that Mr. Smith ever regained control of the vehicle

or brought the vehicle under control during the event. It is undisputed that Mr. Smith was ejected from the vehicle and that no one else qualifies as a driver or operator of the vehicle during this event. This Court rejects Ms. Neighbors' argument that, during the course of the accident and solely through the circumstances of the accident, not through conscious choice or conduct, Mr. Smith can change roles under the terms of the Policy. In other words, neither party cites this Court to authority that permits Mr. Smith's status as driver or operator of the vehicle to transform into "passenger" or "a person struck by the insured vehicle" because he was ejected from the vehicle during the accident. In his capacity as the driver or operator of the vehicle, Mr. Smith is not covered by the Policy. The Court declines to rewrite the terms of the Policy under the rule of strict construction against Shelter so as to bind Shelter to a risk which is plainly excluded and for which Shelter was not paid. *See Castaneda*, 166 S.W.3d at 561. Based on the plain language of the Policy, and construing the record evidence and all reasonable inferences in favor of Ms. Neighbors, the Court finds that Mr. Smith is not an "insured" under the Policy for purposes of medical payments coverage or accident death benefits as a "passenger" or as "an individual, other than one occupying the vehicle, who is struck by the insured vehicle, while he is a pedestrian, bicyclist, motorcyclist, in a horse-drawn wagon or cart, or riding on an animal."

For these reasons, after carefully considering the Policy's language in its "plain, ordinary, [and] popular sense," and considering the record evidence in the light most favorable to Ms. Neighbors as required at the summary judgment stage, the Court determines that Mr. Smith is not covered under the Policy for purposes of medical payments coverage or accident death benefits coverage. *Norris*, 16 S.W.2d at 244.

### D. Discussion: Arkansas Statutes And Public Policy

Instead of arguing directly against the language of the Policy, Ms. Neighbors argues that Shelter's Policy illegally limits classes of insureds through its definitions, in contravention of Arkansas Code Annotated §§ 23-89-202 and 23-89-204 (Dkt. No. 15, at 4-7). Ms. Neighbors asserts that Mr. Smith is covered by the medical payments and accidental death benefits as a passenger and occupant in the insured vehicle and as a person struck by the insured vehicle pursuant to Arkansas law (Dkt. No. 13, at 4, 6). The Court determines that Mr. Smith is not covered by the Policy for the reasons explained. The Court also rejects Ms. Neighbors' arguments that the Policy language is in contravention of applicable Arkansas law, to the extent the Court has construed the Policy language in making a ruling on the threshold issue of whether Mr. Smith can change roles under the terms of the Policy. The Court declines to reach the remaining issues raised by the parties with respect to Policy language and applicable Arkansas law.

In making this limited assessment of applicable Arkansas law as applied to the Policy language construed by the Court in this case, the Court relies on the following Arkansas cases. In *Shelter General Insurance Co. v. Williams*, 867 S.W.2d 457 (Ark. 1993), the trial court granted summary judgment in favor of plaintiffs, determining that plaintiffs were entitled to recover benefits under an insurance policy pursuant to Arkansas Code Annotated § 23-89-202. The trial court reasoned that any exclusion that attempted to limit the no-fault benefits beyond the scope of Arkansas statutory law was void as against public policy. *Id.* at 457. The Arkansas Supreme Court reversed the trial court. The Arkansas Supreme Court determined that "[t]he statutes encompass the mandatory offering of coverage accompanied by the right to reject such coverage in whole or in part, not mandatory coverage of any and all risks." *Id.* at 458.

Under Arkansas law, an insurer may contract with its insured upon whatever terms the parties may agree upon which are not contrary to statute or public policy. *Id.* (citing *Aetna Ins. C. v. Smith*, 568 S.W.2d 11 (Ark. 1978)). The Arkansas Supreme Court observed in *Williams* that the premium paid reflected the lesser coverage as accepted by the insured. Though there is a mandatory minimum, which may be increased by the insurer, there is also a statutory right by the insured to reject the coverages as long as it is accomplished in writing, which had been done in the case. The Arkansas Supreme Court reasoned that, if an insured has the right under Arkansas Code Annotated § 23-89-203 to reject the coverages enumerated in Arkansas Code Annotated § 23-89-202, exclusions that limit the no-fault benefits beyond the scope of statutory law are not void as against public policy. *Id.* at 458. Further, the Arkansas Supreme Court has determined that, "[u]nless the legislature has specifically prohibited exclusions, courts will not find the restrictions void as against public policy. An exclusion to coverage cannot violate public policy when one considers that a driver can opt out of the coverage altogether." *Harasyn v. St. Paul Guardian Ins. Co.*, 75 S.W.3d 696, 699 (Ark. 2002). For these reasons, the Court rejects Ms. Neighbors' public policy arguments as applied to the narrow threshold issue resolved by the Court in this case.

### E. Bad Faith Allegations And Punitive Damages

Shelter argues that summary judgment on Ms. Neighbors' bad faith claim is appropriate because Shelter had investigated the claim and applied the terms within the Policy as they were written before it sent a denial of benefits letter (Dkt. Nos. 9, at 10; 16, at 10). In support of this claim, Shelter submits its May 2, 2017, and April 5, 2017, letters to counsel for Ms. Neighbors (Dkt. No. 9-7). Shelter argues that, even if the allegations that Shelter failed to investigate the claim prior to its denial are true, such allegations are insufficient to sustain a claim of bad faith in Arkansas (Dkt. No. 9, at 10). Shelter also argues that summary judgment is appropriate on Ms.

Neighbors' claim for punitive damages (*Id.*, at 12). Shelter submits that the basis for Ms. Neighbors' lawsuit has never been anything more than a dispute over whether coverage for medical payments and accidental death benefits exists (*Id.*, at 13). Shelter argues that it is undisputed that Shelter applied the terms and conditions of the Policy as they were written and that Ms. Neighbors has not and cannot show that she has been harmed or damaged in any way (*Id.*).

Ms. Neighbors contends that Shelter's denial of coverage on April 5, 2017, prior to even receiving the accident report on April 6, 2017, is an intentional and bad faith attempt to avoid coverage of a valid claim because Shelter sent a denial to the "Joshua Smith Estate C/O Personal Representative" within 12 days of the accident but without benefit of the accident report and never addressing the fact that Mr. Smith was struck by the insured vehicle (Dkt. No. 14, ¶ 19).

Ms. Neighbors also argues that Shelter's motion for summary judgment regarding its alleged bad faith and to prevent an award of punitive damages is premature (Dkt. No. 15, at 8). Ms. Neighbors requests, pursuant to Rule 56(d)(1)-(3), that the Court deny Shelter's motion or grant other appropriate relief to allow her to conduct more discovery (*Id.*). As discussed *supra*, the Court rejects Ms. Neighbors' argument that the motion is premature because she failed to submit an affidavit or declaration explaining why she cannot present facts essential to justify her opposition to Shelter's motion for partial summary judgment. Fed. R. Civ. P. 56(d).

In Arkansas, the tort of bad faith requires affirmative misconduct, without a good faith defense; the affirmative misconduct must be dishonest, malicious, or oppressive in an attempt to avoid the insurer's liability under an insurance policy. *Reynolds v. Shelter Mut. Ins. Co.*, 852 S.W.2d 799, 801 (Ark. 1993) (citing *Findley v. Time Ins. Co.*, 573 S.W.2d 908 (Ark. 1978)). The mere failure to investigate a claim is not the sort of affirmative misconduct that gives rise to a cause of action in tort for bad faith. *Id.*

In *Reynolds*, the Arkansas Supreme Court determined that the only argument the plaintiff-appellants made concerning bad faith was the defendant-appellee insurance company's failure to investigate adequately their claim, and the Court concluded that such conduct did not give rise to a cause of action for bad faith under *Findley*. *Id.* The plaintiff-appellants in *Reynolds* responded to the motion for summary judgment with affidavits and depositions, but the Court determined that none of the evidentiary items presented indicated that the insurance company engaged in affirmative conduct that was malicious, dishonest, or oppressive in order to avoid paying the claim. *Id.*

Here, Ms. Neighbors submitted Shelter's claim file timeline in response to summary judgment (Dkt. No. 13-8). The claim file timeline demonstrates that Shelter determined that Mr. Smith was a permissive driver and was not listed on the Policy and was a "non-resident" before sending the denial letter on April 5, 2017 (*Id.*). Shelter also submitted an exhibit indicating that Shelter spoke with Ms. Ferebee on March 29, 2017, and Ms. Ferebee informed Shelter that "Joshua Smith was a friend of hers and was driving with permission" (Dkt. No. 16-1). The exhibit further indicates that Shelter had discovered that Mr. Smith was a "driver, non-resident, not listed on policy, [and] friend of insured" (*Id.*). Viewing all evidence in the light most favorable to Ms. Neighbors, to the extent the bad faith claim is premised on whether there is coverage for medical payments and accidental death benefits, the Court cannot conclude that Shelter's actions were "malicious, dishonest, or oppressive" "affirmative misconduct." *Reynolds*, 852 S.W.2d at 801. The Court grants summary judgment on Ms. Neighbors' claim against Shelter for punitive damages based on allegations of bad faith to the extent that claim is premised on whether there is coverage for medical payments and accidental death benefits.

### III.    Motion To Quash Plaintiff's Notice Of Rule 30(b)(6) Deposition Of Shelter Mutual Insurance Company

Counsel for Ms. Neighbors sent Shelter a notice of Rule 30(b)(6) deposition on December 20, 2018, along with specific requests for certain items to be produced by the Rule 30(b)(6) representative at the deposition (Dkt. No. 22-1).  Shelter filed a motion to quash plaintiff's notice of Rule 30(b)(6) deposition of Shelter Mutual Insurance Company on January 2, 2019 (Dkt. No. 22).  In the motion, Shelter objects to the notice and the request for production of documents on several grounds (*Id.*, ¶ 2).

First, Shelter argues that it has produced portions of its claim file, including its adjuster's notes and its investigation up to the date the complaint was originally filed in state court on May 12, 2017 (*Id.*).  Second, Shelter asserts that any portion of its claim file and investigation created after the complaint was filed on May 12, 2017, was done in the light of the pending litigation and is privileged as it contains Shelter's mental impressions and legal conclusions (*Id.*, ¶ 3).  Third, Shelter argues that its opinions and conclusions, internal policies and procedures regarding adjuster training, and claims evaluation policies and procedures are irrelevant and seek confidential proprietary information not subject to disclosure (*Id.*).  Fourth, Shelter objects to producing a representative or the requested privileged materials in the light of the pending motion for partial summary judgment (*Id.*, ¶ 4).  Shelter submits that it agrees to produce its representative if the Court deems there is coverage under the relevant provisions for Mr. Smith and that Shelter committed bad faith by denying the claims for medical payments and accidental death benefits to the Estate (*Id.*).  Finally, Shelter argues that the notice is an improper fishing expedition used as a retaliatory tool to seek corroborative evidence of a claim that fails as a matter of law (*Id.*, ¶ 5).  Shelter asks the Court to quash the notice and to enter a protective order pursuant to Rule 26(c)

forbidding the proposed discovery and requiring that trade secrets and other confidential information not be revealed (*Id.*, ¶ 6).

Ms. Neighbors responded in opposition to the motion (Dkt. No. 24). Ms. Neighbors counters that Shelter should be required to produce its entire claim file, including all notes, correspondence, and information compiled or created prior to the initiation of litigation in the Phillips County matter (*Id.*, ¶ 2). Ms. Neighbors concedes that any portion of the claims file produced after litigation commenced in the previous Phillips County matter is not subject to discovery in this matter (*Id.*, ¶ 3). Ms. Neighbors submits that she is aware of no rule that allows Shelter to determine that it will only produce or designate its Rule 30(b)(6) representative or its employee witnesses upon an adverse ruling from the Court (*Id.*, ¶ 4). Ms. Neighbors represents that she will agree to a protective order for any trade secrets that may be discovered (*Id.*, ¶ 6).

The Court holds Shelter's motion to quash under advisement at this time. Because the Court grants Shelter's motion for partial summary judgment, Ms. Neighbors' only remaining claim is for the uninsured motorist benefit (Dkt. No. 3, at 3). To the extent that Ms. Neighbors determines that the requested document production continues to be relevant to her uninsured motorist claim, the Court directs Ms. Neighbors to submit a filing explaining such.

## IV. Conclusion

For the foregoing reasons, the Court grants Shelter's motion for partial summary judgment (Dkt. No. 8). The Court holds under advisement the motion to quash plaintiff's notice of Rule 30(b)(6) deposition (Dkt. No. 22).

It is so ordered this 26th day of March, 2019.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge